UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY T. PADGETT,                 :
                                    :CIVIL ACTION NO. 3:14-CV-504
          Plaintiff,                :
                                    :(JUDGE CONABOY)
          v.                        :
                                    :
CAROLYN COLVIN,                     :
Acting Commissioner of             :
Social Security,                    :
                                    :
          Defendant.                :
                                    :

_____

**MEMORANDUM**

Here we consider Plaintiff's Appeal of Defendant's denial of

Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under Titles II and XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  (Doc. 1.)  The

Administrative Law Judge ("ALJ") who evaluated the claim found that

Plaintiff had the residual function capacity ("RFC") to perform

light work with certain limitations and so denied Plaintiff's claim

for benefits.  (R. 83, 92.)  With this action, Plaintiff argues

that the determination of the Social Security Administration is

error for three reasons: 1) the ALJ analyzed the case from an

incorrect onset date, causing the entire decision to be premised on

harmful error of fact; 2) the ALJ did not give appropriate weight

to the opinions of multiple treating sources; and 3) the ALJ's RFC

assessment is not supported by substantial evidence.  (Doc. 9 at

2.)

For the reasons discussed below, we conclude the case must be

remanded to the Acting Commissioner for further consideration.

## I. Background

### A.   Procedural Background

On October 27, 2010, Plaintiff filed an application for DIB and SSI alleging disability beginning on September 30, 2008.  (R. 155.)  Plaintiff listed three conditions that rendered him unable to work: bipolar disorder, manic depression, and schizo-affective disorder.  (R. 299.)  The claims were initially denied on February 23, 2011.  (R. 165.)  Plaintiff filed a request for a review before an ALJ.  (R. 212.)  On January 8, 2013, Plaintiff, with his attorney, appeared at a hearing before ALJ Ted Burock.  (R. 93.)  Vocational expert Nancy Harter also testified at the hearing. (*Id.*)  At the hearing, Plaintiff amended his alleged onset date of disability to February 9, 2011.  (R. 102.)  He also added chronic neck pain to previously listed disabling conditions.  (R. 96.)  By decision of February 22, 2013, ALJ Burock determined that Plaintiff had not been under a disability from September 8, 2008, through the date of the decision.  (R. 92.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.
>
> 2.   The claimant has not engaged in substantial gainful activity since September 30, 2008, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

2

3.   The claimant has the following severe impairments: Headaches, Degenerative Disc Disease of the Cervical Spine, Back Pain, Bipolar Disorder, Depression, and Anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is limited to performing work requiring no contact with the public and occasional interaction with co-workers and supervisors. The claimant is limited to performing simple, routine, and repetitive tasks involving 1 and 2-step tasks. The claimant is limited to performing work involving occasional changes in the work setting. The claimant is limited to performing production oriented jobs requiring no independent decision-making.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May 8, 1965 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capability, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 81-92.)

On April 2, 2013, Plaintiff filed a Request for Review with the Appeal's Council.  (R. 354-55.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (R. 1-6.) In doing so, the Appeals Council stated that it had looked at additional records provided by Plaintiff and determined the new information was about a time later than the end date of February 23, 2011--the date the ALJ decided the case--and therefore did not affect the decision of whether he was disabled on or before that date.  (R. 2.)  Plaintiff was advised that if he wanted consideration of whether he was disabled after February 22, 2013, he would need to apply again.  (R. 2.)  Because the Appeals Council

found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner pursuant to 20 C.F.R. §§ 404.981, 416.1481 (2014). (*See* R. 1.)

On March 17, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision. (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on May 14, 2014. (Docs. 7, 8.) Plaintiff filed his supporting brief on June 26, 2014. (Doc. 9.) Defendant filed her opposition brief on July 31, 2014. (Doc. 10.) With the filing of Plaintiff's reply brief (Doc. 11) on August 8, 2014, this matter became ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on May 8, 1965. (R. 90.) He completed the ninth grade and got a GED in 1985 or 1986. (R. 100.) Plaintiff reported that his last job was prepping booms to be paint sprayed. (R. 114.) He also reported that between September 30, 2008, and February 9, 2011, he did "some odds and end cleanups and stuff like that." (R. 102.)

**1.   <u>Mental Impairments</u>**

In September 2010, Plaintiff began psychiatric treatment at Momentum Services, LLC. (R. 466.) Following a psychiatric evaluation on September 30, 2010, the record contains progress notes dated October 28, 2010, November 24, 2010, and December 21,

2010.[1]  (R. 457, 465-66.)

On January 10, 2011, Dr. P. Moskel of Momentum Services completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  (R. 461-62.)  The record indicates that prior to the completion of the questionnaire, Plaintiff had been seen four times: on September 30, 2010, October 28, 2010, November 24, 2010, and December 21, 2010.  (R. 464-65.)  Dr. Moskel found that Plaintiff's ability to understand, remember and carry out instructions were affected by his mental impairments.  (R. 461.) Relatedly, Dr. Moskel opined that Plaintiff had moderate restrictions in the category of understanding and remembering short, simple instructions and the category of carrying out short, simple instructions.  Dr. Moskel found Plaintiff had a marked restriction in his ability to understand and remember detailed instructions, and extreme difficulties in his ability to carry out detailed instructions and make judgments on simple work-related decisions.  (R. 461.)  Dr. Moskel noted the following medical/clinical findings supporting the assessment: Plaintiff's "diagnosis of 298.9 Psychotic Disorder NOS impairs his ability to process information as well as his judgment process [and his] inability to follow directives is a result of his impaired cognition."  (R. 461.)

---

[1]  The progress notes are largely illegible.  (R. 465-66.)

Next Dr. Moskel found that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was affected by his mental impairments. (*Id.*) He found that Plaintiff had extreme restrictions in his abilities to interact with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (*Id.*) Dr. Moskel explained the support for this assessment as follows:

> Jeffrey has a history of severe temper dyscontrol. He has been verbally and physically abusive to friends, coworkers and strangers. He has great difficulty regulating his emotions. He is paranoid and defensive especially when interacting with authority figures. Jeffrey lacks boundaries and threatens others when he feels nervous. He lacks the skills to tolerate frustration.

(R. 461.)

Finally, Dr. Moskel noted that another capability affected by Plaintiff's mental impairments is social skill with the effect that he lacks appropriate skills. (R. 462.) He stated that the medical/clinical findings supporting this assessment are that Plaintiff "prefers to be alone and spends his time alone. His mood is unpredictable. He lacks social skills that would be essential in the work place." (*Id.*)

On February 9, 2011, Plaintiff was evaluated by a consultative examiner, Edward Yelinek, Ph.D. (R. 483-89.) Dr. Yelinek observed

7

that Plaintiff

> was awake and alert for the evaluation.  He
> was oriented to time, place, person, and
> situation.  He could state the purpose for
> the evaluation.  He was casually, but neatly
> and appropriately dressed for the situation.
> He appeared well groomed.  He walked easily
> from the waiting room to the evaluation room.
> There were no noticeable problems with either
> posture or gait.  There were no noticeable
> behavioral abnormalities, no tics.  His mood
> appeared depressed.  His affect appears
> somewhat flat.  . . . He sits immobile in his
> chair staring at the floor.  He sleeps
> poorly. . . . His appetite is poor. . . . His
> stamina is good. . . . His interests are
> poor.  He is socially withdrawn. . . .

> . . . .

> His concept formation is good.  Mr.
> Padgett is able to think abstractly. . . .

> His perceptions appear intact at the
> time of the evaluation.  There was no
> evidence for delusions or hallucinations.
> There was ample evidence for both
> hallucinations and delusions in the past.
> There was ample evidence for suicidal
> intention in the past.  He denied current
> suicidal ideation or intent.  He denied
> current homicidal ideation or intent.  He did
> speak of assault in the past.  "I was in
> jail.  They put me on lithium."  He indicates
> that he prefers to keep his distance from
> people now.  There was no evidence for
> obsessions or compulsions.  There was no
> evidence for any unusual fears.  His thought
> content centered on poor interpersonal
> functioning.  His speech was clear and easily
> understandable.  His thought processes
> appeared goal-oriented.

> His memory appeared adequate. . . .

> There was ample evidence for poor social
> functioning.  He has been incarcerated many

8

> times.  He mentioned that he had been
> incarcerated for both assault and theft.

(R. 484-85.)

Dr. Yelinek's diagnostic impression included Bipolar I disorder and a GAF of 50.  (R. 486.)  In the Prognosis section of the report, Dr. Yelinek noted that Plaintiff "believes his medications are helping him.  He indicated he believes his moods are more stable."  (*Id.*)  Dr. Yelinek added that Plaintiff has had difficulty with psychiatric problems for many years and he believed "the likelihood for any significant improvement in the near term to be fairly poor."  (*Id.*)

In completing the form regarding Plaintiff's work-related capabilities, Dr. Yelinek found that Plaintiff's ability to understand, remember and carry out instructions were affected by his impairment.  (R. 488.)  Relatedly, Dr. Yelinek opined that Plaintiff had slight restrictions in each of the following categories: understanding and remembering short, simple instructions; carrying out short, simple instructions; understanding and remembering detailed instructions; carrying out detailed instructions; and making judgments on simple work-related decisions.  (R. 461.)  Dr. Yelinek noted the medical/clinical findings supporting the assessment were Plaintiff's ability to recall five digits forward and four reversed, and his ability to perform serial sevens.  (R. 488.)

Next Dr. Yelinek found that Plaintiff's ability to respond

appropriately to supervision, co-workers, and work pressures in a work setting was affected by his mental impairments.  (*Id.*)  He found that Plaintiff had marked restrictions in his abilities to interact with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting.  (*Id.*)  Dr. Yelinek explained the support for this assessment as Plaintiff's "[p]oor social judgment[,] [r]eadily stimulated anxiety reaction[,] and emotional dep regulation."  (R. 488.)  Finally, Dr. Yelinek did not find that any other capabilities were affected by the impairment.  (R. 489.)

The records from Momentum Services, LLC, include a progress note dated February 16, 2011, signed by K. Elnaggar, M.D.  (R. 525.)  The note states that Plaintiff "is currently diagnosed with bipolar disorder, psychotic disorder NOS, and polysubstance dependence in early sustained remission."  (*Id.*)  Regarding "Patient Progress,"  Dr. Elnaggar notes that Plaintiff "states that his mood has been stable for the past several months, and he denies any recurrence of psychosis. . . . He firmly denies suicidal or homicidal ideation and contracts."  Dr. Elnaggar adds that Plaintiff, at the time, was under a lot of stress related to "custody of his 12 year-old daughter, who has significant behavioral problems.  Also, his estranged wife has custody of his 9-year-old son, and he worries about her substance abuse problems."

(*Id.*)  In the "Mental Status Exam" portion of the progress note,

Dr. Elnaggar stated that Plaintiff was "casually dressed and

groomed (clean, unshaven), polite and cooperative.  Speech was of

normal rate, tone, and volume.  He was somewhat tense but not

restless.  Eye contact was good.  Affect was euthymic.  Thoughts

were logical and linear, and clear and coherent.  There was no

evidence of impaired concentration or focus."  (*Id.*)

Under the multiaxial system for assessment of mental health,

(The Diagnostic and Statistical Manual of Mental Disorders, often

referred to as the DSM)[2], Dr. Elnaggar reported the following:

---

[2]  The DSM had five "axes" up until May of 2013: Axis I -
Clinical Syndromes/Disorders; Axis II - Personality
Disorders/Mental Retardation; Axis III - Medical Conditions; Axis
IV - Psychosocial and Environmental Stressors; and Axis V - Global
Assessment functioning.  Psyweb.com/content/main-pages/dsm-5-fifth-
edition-of-the-diagnostic-and-statistical-manual-of-mental-
disorders.  This system has been replaced with the DSM-5 which
employs a nonaxial system of documentation.  *Id.*  Following is a
brief explanation of each axis.

Axis I:     This is the top-level diagnosis
            that usually represents the acute
            symptoms that need treatment. . . .

Axis II:    Axis II is the assessment of
            personality disorders and
            intellectual disabilities.  These
            disorders are usually life-long
            problems that first arise in
            childhood. . . .

Axis III:   Axis III is for medical or
            neurological conditions that may
            influence a psychiatric problem. .
            . .

Axis IV:    Axis IV identifies recent

"Axis I: Bipolar Disorder in Partial Remission[,] History of Psychosis[,] Polysubstance Dependence in Early Sustained Remission; Axis II: Deferred; Axis III: Hepatitis B[,] Hepatitis C; Axis IV: Severe; Axis V: 60." (R. 525.)

On February 18, 2011, Phyllis A. Brentzel, Psy.D., the State agency psychological consultant, assessed Plaintiff's functional capacity. (R. 130-39.) Based on the evidence reviewed[3], Dr. Brentzel found that Plaintiff's mental impairments resulted in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in

---

psychosocial stressors - a death of a loved one, divorce, losing a job, etc. - that may affect the diagnosis, treatment, and prognosis of mental disorders. . . .

Axis V: Axis V identifies the patient's level of function on a scale of 0-100 (100 is top level functioning). Known as the Global Assessment of Functioning (GAF) Scale, it attempts to quantify a patient's ability to function in daily life. . . . At the middle of the scale, a rating of 41-50 is for symptoms that lead to antisocial behavior (kleptomania) or social dysfunction (inability to keep a job). . . .

[3] The "Disability Determination Explanation" indicates that the evidence reviewed included Dr. Yelinek's consultative examination, records of consultative medical examiner Mohammed Haq, M.D., records from Roxbury Treatment Center (from February 2010 (see R. 360-74)), and Momentum Services, LLC. (R. 131-32.) The record does not indicate that Dr. Brentzel reviewed Dr. Elnaggar's February 16, 2011, progress note (R. 525). (See R. 135, 138-39.)

maintaining concentration, persistence or pace, and that Plaintiff had no repeated episodes of decompensation, each of extended duration.  (R. 134.)  Regarding more specific capabilities, Dr. Brentzel found Plaintiff to be at most moderately limited. Moderate limitations were found in the following categories: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or in proximity to others without being distracted by them; ability to make simple work-related decisions; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to respond appropriately to changes in the work setting.  (R. 137-38.) Dr. Brentzel explained that Plaintiff "can perform simple, routine, repetitive work in a stable environment . . . [and] can understand, retain, and follow simple job instructions, i.e., perform one and two step tasks."  (R. 137.)  Dr. Brentzel also determined that Plaintiff "is able to carry out very short and simple instructions

13

. . . [, and] is able to maintain concentration and attention for extended periods." (*Id.*)  She found Plaintiff to be self-sufficient with functional social skills.  (R. 138.)  She also found that Plaintiff could "function in production oriented jobs requiring little independent decision making . . . [and] he would be able to make simple decisions." (*Id.*)  Dr. Brentzel provided the following additional explanation for her opinion:

> The opinion stated within the report received 01/12/11 provided by Momentum Services L.L.C., a treating source, has been considered.  The residual functional capacity assessment is different than the opinions expressed by Momentum Services L.L.C. in the report received 01/12/11 due to inconsistencies with the totality of the evidence in the file.  Some of the opinions cited in the report are viewed as an overestimate of the severity of the claimant's functional restrictions.  The treating source statements in the report concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments and making personal and social adjustments are not consistent with all the medical and non-medical evidence in the claims folder.  The claimant only had a brief treating relationship with the psychiatrist.  Finally, the report submitted by Momentum Services L.L.C., received 01/12/11, is given appropriate weight and is partially consistent with this assessment.
>
> The opinion stated within the report received 02/11/11 provided by Edward J. Yelinek, Ph.D., an examining source, has been considered.  The residual functional capacity assessment partially reflects the opinion of Edward J. Yelinek, Ph.D.  The residual functional capacity assessment reflects certain aspects of the opinions contained in

14

> the report received 02/11/11 as explained
> below.  The occupational adjustments are
> fairly consistent with the other evidence in
> the file.  However, the examining source
> statements regarding his abilities in the
> areas of making performance adjustments and
> making personal and social adjustments are
> not consistent with all of the medical and
> non-medical evidence in the claims folder.
> The evidence provided by the examining source
> is based on an isolated exam and is an
> overestimate of the severity of the
> claimant's his [sic] limitations.  Therefore,
> great weight cannot be given to the examining
> source's opinion.  Therefore, the report
> submitted by Edward J. Yelinek, Ph.D.,
> received 02/11/11, is given appropriate
> weight and is partially consistent with this
> assessment.

(R. 138-39.)

On February 6, 2012, Plaintiff had an office visit with Jason Galicia, M.D., of Keystone Health/Keystone Internal Medicine.  (R. 501.)  Dr. Galicia reports that the reason for the visit was for form completion and that Plaintiff had chronic hepatitis C and depression.  (*Id.*)  Regarding the depression, Dr. Galicia noted that Plaintiff "was diagnosed with bipolar disorder by his psychiatrist, will trial him again on Depakote at the same dose he was being given in jail and encouraged to follow up with psychiatry."  (*Id.*)  Dr. Galicia also commented that Plaintiff had last been seen in 2010

> and apparently got into a manic episode and
> was incarcerated for assault for 4 months and
> recently got out of jail 3 weeks ago.  He has
> not been taking any medications for his
> bipolar disorder but apparently was being
> given Depakote 1500 mg in jail but recalls

15

> being given a different medication is [sic] psychiatrist. . . . Needs disability forms filled.

(R. 501.)

On March 19, 2012, Plaintiff again visited Dr. Galicia for a medication refill and right knee pain. (R. 503.) Dr. Galicia commented that Plaintiff reported "that he had followed up with psychiatry and was taken off Depakote and was started on 3 medications for his depression. Patient has been doing stable . . . ." (*Id.*)

On April 4, 2012, Dr. P. Moskel of Momentum Services again filled out a questionnaire--"Mental Impairment Questionnaire (RFC & Listings)." (R. 491.) From the records provided, it appears Plaintiff had not been seen from December of 2010 to February of 2012. (R. 464, 524, 526.) Plaintiff had been seen on February 26, 2012, and March 16, 2012, prior to the completion of the questionnaire. (R. 523, 524.) Dr. Moskel noted that he planned to see Plaintiff weekly and that his GAF score was 55 and his prognosis guarded. (R. 491.) He described his clinical findings demonstrating Plaintiff's mental impairment and symptoms to include auditory hallucinations and paranoid delusion.[4] Dr. Moskel indicated that Plaintiff had numerous signs and symptoms. (R. 492.) In the category of "Mental Abilities and Aptitudes Needed to

[4] Some of Dr. Moskel's written notes are not legible. (*See* R. 491.)

Do Unskilled Work," Dr. Moskel indicated that Plaintiff was unable to meet competitive standards in the following areas: "Maintain attention for two hour segment"; "Maintain regular attendance and be punctual within customary, usually strict tolerances"; "Sustain an ordinary routine without special supervision"; "Work in coordination with or proximity to others without being unduly distracted"; "Complete a normal workday and workweek without interruptions from psychologically based symptoms"; "Ask simple questions or request assistance"; "Accept instructions and respond appropriately to criticism from supervisors"; "Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes"; "Respond appropriately to changes in a routine work setting"; and "Deal with normal work stress."  (R. 493.)  Dr. Moskel did not explain the medical/clinical findings that support the assessment as requested in the questionnaire. (*Id.*)  In the area of aptitudes needed to do semiskilled and skilled work, Dr. Moskel indicated that Plaintiff was unable to meet competitive standards in his ability to "[s]et realistic goals or make plans independently of others," and "[d]eal with stress of semiskilled and skilled work."  (R. 494.)  The medical/clinical findings supporting the assessment include Dr. Moskel's notation that Plaintiff "cannot work with others as he experiences psychotic symptoms and severe mood lability almost daily.  He has been incarcerated frequently and has demonstrated violent behavior.  He

can demonstrate paranoid thought processes that lead to him acting out impulsively." (R. 494.)  In Dr. Moskel's assessment of Plaintiff's abilities to do particular types of jobs, he found Plaintiff was unable to meet competitive standards in his ability to "[i]nteract appropriately with the general public." (*Id.*)  The medical/clinical findings supporting the assessment include Dr. Moskel's notation that Plaintiff "has been unable, for many years, to interact appropriately with strangers as he experiences increased levels of anxiety and paranoia.  His ability to attend to his activities of daily living. [sic]" (*Id.*)  Dr. Moskel assessed Plaintiff's functional limitations to be extreme in the area of his difficulty in maintaining social functioning. (R. 495.)  He noted that Plaintiff had four or more "[e]pisodes of decompensation within 12 month period, each at least two weeks duration."[5]  (R. 495.)  The form directs the professional completing the

---

[5] Episodes of decompensation are defined as

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).

(R. 495.)

18

questionnaire to provide the approximate dates of each episode of decompensation if the patient, "within one year . . . had more than three episodes of decompensation of shorter duration than two weeks or less frequent episodes of decompensation of longer duration than two weeks."  (R. 495.)  Dr. Moskel noted that Plaintiff's "most recent episode of decompensation (Sept. 2011) ended with his incarceration."  (*Id.*)

Dr. Moskel indicated that his patient was in the category of having a

> [m]edically documented history of a chronic organic mental, schizophrenia, etc., or affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and  . . . [t]hree or more episodes of decompensation within 12 months, at least two weeks long[, and a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

(R. 495.)  Dr. Moskel also opined that Plaintiff would miss more than four days of work per month, that his impairment had lasted, or could be expected to last, more than twelve months, and that his impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation.  (R. 496.)

On November 28, 2012, Alex Dever, M.D., filled out another "Mental Impairment Questionnaire (RFC & Listings)."  (R. 530.)  He

19

noted that Plaintiff began treatment on February 12, 2012, and was seen weekly by a clinician and monthly by a psychiatrist. (*Id.*) Dr. Dever evaluated Plaintiff's GAF score to be 75 and his prognosis was guarded. (*Id.*) He noted that Plaintiff had been compliant with treatment, had "exhibited a partial response but remains impaired." His clinical findings included low energy, dysphoria, social withdrawal, anxiety, and impaired concentration and attention span. (*Id.*) Plaintiff's signs and symptoms are similar to those identified by Dr. Moskel. (R. 531.) Dr. Dever's assessments regarding Plaintiff's ability to do unskilled work were also similar to Dr. Moskel's. However, Dr. Dever found Plaintiff's ability to ask simple questions or request assistance to be "Unlimited or Very Good" rather than "Unable to meet competitive standards," and he found Plaintiff's ability to respond appropriately to changes in a routine work setting to be "Seriously limited, but not precluded" rather than "Unable to meet competitive standards." (R. 493, 532.) Dr. Dever did not provide requested explanations for his assessment. (R. 532.) The reports also differ in that Dr. Dever found that Plaintiff was seriously limited rather than unable to meet competitive standards in his ability to set realistic goals or make plans independently of others. (R. 494, 533.) Dr. Dever additionally noted that Plaintiff would have difficulty working at a regular job on a sustained basis because he "struggles with mood lability on a

regular basis.  He has a . . . history of abuse and neglect from childhood into adulthood that makes it difficult for him to sustain healthy relationships."  (R. 535.)

On November 12, 2012, the last progress note from Momentum Services, LLC, the provider states that Plaintiff reported to be "doing better.  Mood/energy/sleep/outlook all improved."  (R. 517.) The note also indicates that Plaintiff's affect was within normal range and his mood was good.  (*Id.*)

On November 21, 2012, Dr. Galicia noted Plaintiff's depressive disorder was under fair control and that Plaintiff was stable on his current psychiatric regimen.  (R. 547.)

**2.   Physical Impairments**

On April 1, 2010, Plaintiff was seen by Stephanie S. Cabello, M.D., and she noted that Plaintiff had a history of chronic low back pain.  (R. 392.)  On April 7, 2010, Plaintiff had diagnostic imaging ordered by Dr. Cabello due to his history of low back pain. (R. 383.)  The impression was "minimal degenerative changes." (*Id.*)  On June 8, 2010, Dr. Cabello noted that Plaintiff needed to refill his prescription for naproxin for his low back pain.  (R. 391.)  At Plaintiff's July 1, 2010, routine follow up office visit with Dr. Cabello, Plaintiff's back pain was not noted.  (R. 390.) Dr. Cabello recorded that Plaintiff was not in acute distress. (*Id.*)

On January 26, 2011, Mohammad S. Haq, M.D., performed a

consultative examination of Plaintiff. (R. 468-76.) In addition to symptoms associated with his mental impairments (R. 469-70), Plaintiff complained of having a pain in his back, primarily in the lower thoracic area. (R. 470.) Plaintiff reported that the pain was persistent and radiated into the neck, adding that he could not stand for more than a couple of hours because the pain would become moderately severe and he would have to sit down. (*Id.*) Plaintiff also reported that he starts feeling numbness in his feet and legs after sitting for an hour or so. (*Id.*) Upon physical examination, Dr. Haq observed generally that Plaintiff was "conscious and alert, active and oriented, sitting comfortably in the chair appears depressed." (R. 471.) Dr. Haq found Plaintiff's neck supple. (*Id.*) Dr. Haq reported the following regarding his musculoskeletal exam: no atrophy noted; mild degree of kyphosis; no tenderness in the lower thoracic paraspinal area without any spasm; range of motion at the lumbosacral spine normal but slightly limited at the neck; and no spasm in the neck area. (*Id.*) Dr. Haq's neurological examination showed the following: higher functions all normal; cranial nerves all intact are normal; deep tendon reflexes present but diminished bilaterally both in upper and lower extremities; no motor deficit; and no sensory loss. (*Id.*) Dr. Haq assessed Plaintiff to have "depression, bipolar with paranoid symptoms," and "mild kyphosis with musculoskeletal pain in the lower thoracic area." (R. 472.) Dr. Haq concluded Plaintiff was able to lift up

22

to twenty pounds frequently and carry up to ten pounds frequently, he could walk and stand for two to three hours in an eight-hour day and sit for two hours.  (R. 473.)  His postural activities of stooping, crouching, and climbing were limited to occasional and he had no limitations of other physical functions.  (R. 474.)

On February 1, 2011, Dilip S. Kar, M.D., a state agency medical consultant, assessed Plaintiff's functional capacity and concluded he was not disabled.  (R. 135-36, 139-41.)  He found Plaintiff could frequently lift and/or carry fifty pounds and occasionally one hundred pounds or more.  (R. 135.)  Dr. Kar concluded that Plaintiff could stand and/or walk for six hours in an eight-hour day, could sit for the same period of time, and has no limitation in his ability to push and/or pull except for that noted in his ability to lift and/or carry.  (*Id.*)

On February 21, 2012, Plaintiff had an office visit with Jason Galicia, M.D., at Keystone Health.  (R. 501-02.)  Plaintiff had last been seen in 2010.  (R. 501.)  The purpose of the visit was to have disability forms filled out.  (*Id.*)  Dr. Galicia listed the following problems as chronic: acute hapatitis C; personal history of tobacco use; nondependent tobacco use disorder; lumbago; depressive disorder, not elsewhere classified.  (R. 502.)

On March 19, 2012, Plaintiff saw Dr. Galicia for a medication refill and right knee pain.  (R. 503-04.)  To the chronic problems noted in February, Dr. Galicia added right knee pain.  (R. 504.)

23

On April 19, 2012, because he had been experiencing chest pain for a few weeks, Plaintiff was seen at Keystone Health by Certified Registered Nurse Practitioner Kathy Tolleson. (R. 506-08.) Ms. Tolleson's physical examination of the neck showed that the "range of motion is/has decreased." (R. 507.) She commented that there was no lateral range of motion bilaterally and very limited range of motion with flexion and extension. (R. 507.) After reviewing an earlier CT scan, her assessment of Plaintiff included a finding of cervical neck pain with evidence of disc disease. (R. 506.) Ms. Tolleson suggested that Plaintiff have an MRI and noted that she would send a referral. (*Id.*)

On May 9, 2012, Plaintiff was again seen by Ms. Tolleson. (R. 509-12.) His chief complaint was neck pain. (R. 509.) Ms. Tolleson recorded that the onset of the problem was "months ago" and it had worsened. (*Id.*) At the time of the visit, the problem was noted to be severe and the pain constant. (*Id.*) Plaintiff was scheduled to see a neurologist on June 15, 2012. (*Id.*)

On June 28, 2012, Plaintiff was seen at WellSpan Neurology by Xi Lin, M.D.[6] (R. 574-75.) Dr. Lin reported that examination showed exquisite pain tenderness over the exit zone of the greater occipital nerve on the right side, and over right splenis capitis

---

[6] This appears to be Plaintiff's second visit with Dr. Lin as Dr. Lin notes that Plaintiff had received occipital nerve block at his last appointment and had been headache free for two weeks until three days prior to the June 28, 2012, office visit when he started persistent neck pain on the right side. (R. 573.)

muscle and trapezius muscle.  (R. 573.)  He received occipital nerve block and trigger point injections to treat his cerviogenic headache and severe right-sided neck pain.  (R. 572.)

On August 22, 2012, Plaintiff was seen by Dr. Galicia because of persistent diarrhea.  (R. 513.)  Cervical spinal stenosis and cervical disc disease were noted as chronic problems but neither was addressed at this office visit.  (R. 515.)

On November 6, 2012, Plaintiff again saw Dr. Lin.  (R. 578-79.)  Dr. Lin reported that Plaintiff had exquisite tenderness over the occipital area and a CT of the cervical spine showed degenerative changes with neuroforamina narrowing at C3/C4.  (R. 578.)

On November 21, 2012, Plaintiff had an office visit with Dr. Galicia.  (R. 547-48.)  The chief complaint/reason for visit was to discuss his neurology appointment.  (R. 547.)  Dr. Galicia noted the following regarding Plaintiff's cervical disc disease: "Status: Fair Control.  The patient is taking medications regularly. Additional information: With cervical disc bulging.  Comments: Patient has been getting occipital nerve blocks from neurology, was advised to do pain management."

On November 26, 2012, Plaintiff saw Dr. Galicia because of a headache.  (R. 551.)  Dr. Galicia opined that the "headache could be related to tension versus migraine versus cervical radicular symptoms."  (*Id.*)  He treated Plaintiff with medication and planned

25

to reevaluate him in the next two weeks.  (*Id.*)

On December 13, 2012, Plaintiff had his follow up visit with Dr. Galicia.  (R. 555.)  Plaintiff had improvement with his headaches.  (*Id.*)  Dr. Galicia explained to Plaintiff that his "headache may be multifactorial in that the right vertebral artery occlusion may contribute to his symptoms as well as his neck issues.  He also may be having just plain migraines."  (*Id.*)  Dr. Galicia increased Plaintiff's Fioricet and planned to reevaluate him in three months.  (*Id.*)

On January 7, 2013, Dr. Lin again noted exquisite tenderness over occipital area and recorded the following impression: small central disc protrusion and moderate right foraminal narrowing at C3-C4; small right paracentral disc protrusion and biforaminal narrowing at C6-C7; uncertainty regarding possible biforaminal stenosis; mild right foraminal narrowing at C4-C5 and C5-C6; and slight disc bulge at C2-C3.  (R. 582-83.)  Dr. Lin administered trigger point injections, and Plaintiff reported pain relief and improved range of motion shortly after injections.  (R. 584.)

On January 14, 2013, Plaintiff went to Summit Physical Medicine and Rehabilitation for neck pain and headache.  (R. 621.) On the same date he filled out a "Neck Pain & Disability Questionnaire."  (R. 617-18.)  Plaintiff reported the following: the pain was moderate at the time; he could normally look after himself but it caused pain; pain prevented him from lifting heavy

weights, but he could manage light weights if they were conveniently positioned; he could read as much as he wanted with slight pain in his neck; he had severe headaches which occurred frequently; he could concentrate fully when he wanted to with slight difficulty; he was not able to do his usual work; he was able to drive without neck pain; his sleep was slightly disturbed (less than one hour of sleeplessness); and he could hardly do any recreational activities because of the pain in his neck.  (*Id.*)

On February 13, 2013, Plaintiff went to Summit Pain Medicine where it was noted that Plaintiff stated he had headaches daily with a baseline pain of five out of ten and worsening to ten of ten during periods of exacerbation.  (R. 595.)  He reported that the exacerbation occurs especially with activities of bending and twisting movements of his neck and lower back.  (*Id.*)  Plaintiff described the location of the pain as mostly in his neck and lower back as well as radiation of the neck pain up his left scalp to his forehead.  (*Id.*)  He also noted improvement in his overall function status and his ability to sleep and perform activities of daily living and social functioning since he was started on pain medications.  (*Id.*)

Based on this record, the ALJ made the findings of fact and conclusions of law set out above.  The ALJ gave great weight to the opinion of Dr. Brentzel, the State agency psychological consultant, that Plaintiff was able to function in production oriented jobs

requiring little decision making because he found her opinion to be consistent with the objective clinical findings of record.  (R. 87.)  The ALJ gave significant weight to the opinion of Dr. Kar, the Sate agency medical consultant, to the extent Dr. Kar's opinion indicates that Plaintiff is able to work full-time.  (R. 87.)  The ALJ notes that the weight attributed to the opinion is based on its consistency with treatment notes of record.  (R. 87-88.)  The ALJ also explains his reasons for limiting reliance on the opinions of Plaintiff's treating and examining physicians.  (R. 87-90.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[7]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a

---

[7]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 91.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft*

*v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  A reviewing court is "bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Plummer*, 186 F.3d at 427 (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).  Therefore, we will not set aside the Commissioner's final decision if it is supported by substantial evidence, even if we would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

Finally, the Third Circuit has recognized that it is necessary for the Secretary to analyze all evidence. If he has not done so and has not sufficiently explained the weight he has given to all

probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected. "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Only where the ALJ rejects conflicting probative evidence must he fully explain his reasons for doing so. *See*, *e.g.*, *Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 788-89 (3d Cir. 2003) (citing *Kent v. Schweiker*, 710 F.2d110, 114 (3d Cir. 1983)). Further, the ALJ does not need to use particular language or adhere to a particular format in conducting his analysis. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there

is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

## B.   *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the ALJ erred on three bases: 1) the ALJ analyzed the case from an incorrect onset date, causing the entire decision to be premised on harmful error of fact; 2) the ALJ did not give appropriate weight to the opinions of multiple treating sources; and 3) the ALJ's RFC assessment is not supported by substantial evidence.  (Doc. 9 at 2.)

## 1.   Onset Date

Plaintiff first argues that the ALJ committed reversible error by analyzing the issue of disability from the wrong onset date because the decision rests on facts not relevant to Plaintiff's ability to work.  (Doc. 9 at 10.)  Defendant asserts that Plaintiff has the burden of showing that an error is harmful, and he has failed to show that the ALJ's misstatement of the alleged onset date was harmful to the disability determination.  (Doc. 10 at 10 (citing *Shineski v. Sanders*, 556 U.S. 396, 409 (2009)).)  For the reasons discussed below, we conclude Plaintiff has met his burden on this issue.  Because the ALJ's analysis of Plaintiff's eligibility for disability from the wrong onset date leaves us unable to determine whether his decision is based on substantial

33

evidence, this matter must be remanded.

Plaintiff asserts the determination of an onset date is a critical component of the disability determination process. (Doc. 9 at 10 (citing SSR 83-20).) Plaintiff further asserts that the ALJ's use of the wrong onset date of September 30, 2008, is harmful error because the ALJ relied on evidence that was not relevant to Plaintiff's claim that he was disabled as of February 9, 2011. (Doc. 9 at 11.) Plaintiff identifies the main problem with the use of the incorrect date as the ALJ's heavy reliance on the opinions of non-examining, non-treating state agency medical and psychological consultants: the only relevant evidence viewed by the psychological consultant, Dr. Brentzel, was examining consultant Dr. Yelinek's examination and medical source statement made on the amended onset date; and the review of the medical reviewing consultant, Dr. Kar, was performed before the amended onset date. (Doc. 9 at 12.)

First, we note that the ALJ extensively reviewed the medical evidence and provided significant analysis of the evidence of record. (R. 84-90.) However, the strengths of his decision are undermined by the use of an incorrect disability onset date and the weight given to certain evidence.

The ALJ gave "great weight" to Dr. Brentzel's February 18, 2011, opinion that Plaintiff could function in production oriented jobs requiring little independent decision making. (R. 87.) The

34

ALJ did so because he found the opinion "consistent with the objective clinical findings of record, including Dr. Yelinek's findings that the claimant has adequate attention, concentration, and memory and Dr. Elnaggar's findings that the claimant's thoughts were logical, linear, clear, and coherent with no evidence of impaired concentration or focus." (R. 87.)

The main problem with the ALJ's reliance on Dr. Brentzel's opinion is that the record reveals that Plaintiff's mental health issues were not stable during the relevant time period as evidenced by treating source records and opinions from February 2011 to February 2013, *see supra* pp. 15-21, and Dr. Brentzel did not review any of these records.  If we discount or eliminate the reliance on Dr. Brentzel's opinion, finding substantial evidence for the ALJ's opinion is problematic, particularly because the ALJ undermines the treating source opinions of Dr. Moskel and Dr. Dever primarily based on records from the first month of Plaintiff's claimed disability, i.e., Dr Yelinek's consultative examination findings of February 9, 2011, and a progress note from treating source Dr. Elnaggar dated February 16, 2011. (*See* R. 89-90.)  This problem is exacerbated by the fact that although the ALJ relied on Dr. Yelinek's opinion in certain respects, he gave it limited weight regarding Plaintiff's marked difficulties in his abilities to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to work pressures and to

35

changes in a routine work setting (R. 88)--aspects of his opinion that are consistent with the later treating source findings of Dr. Moskel and Dr. Dever. *See supra* pp. 15-21.  The ALJ supported the assessment with the observation that Dr. Yelinek examined Plaintiff only once and had a limited opportunity to observe his functional abilities prior to rendering an opinion.  (R. 88.)  This reflects Dr. Brentzel's discounting of Dr. Yelinek's performance, personal, and social difficulties because they were not consistent with evidence in the claims folder and were based on an isolated exam. (R. 139.)  Because the evidence in the claims folder pre-dates Plaintiff's onset date, the problem of reliance on Dr. Brentzel's opinion both on its own for its use in undermining certain aspects of Dr. Yelinek's opinion is again apparent.

Similarly, the ALJ's conclusion that the opinion of the state agency medical consultant, Dr. Kar, is entitled to significant weight is problematic because of the time it took place and the information upon which it is based.  The February 1, 2011, assessment predates Plaintiff's onset date of February 9, 2011. Plaintiff's complaint of chronic neck pain post dates the assessment by approximately one year in that his knee problem first noted in the evidence of record at Plaintiff's April 19, 2012, visit to Keystone Health.  (R. 506-07.)  On May 9, 2012, Plaintiff reported that the onset of the pain was "months ago" and it had worsened.  (R. 509.)  Subsequent medical records indicate the

36

condition was ongoing, was treated with differing modalities, and Plaintiff received varying results with the treatment.  *See supra* pp. 24-28.  The ALJ found Plaintiff had the severe impairment of Degenerative Disc Disease of the Cervical Spine.  (R. 81.)  Thus, his attribution of significant weight to an assessment that clearly predates the onset of the condition cannot be considered harmless error.  Further, the ALJ's reliance on the findings of Dr. Cabello and Dr. Haq that Plaintiff had a slightly limited range of motion of the neck with only a mild degree of kyphosis (R. 89) cannot be seen to support his conclusions regarding Plaintiff's physical limitations because these doctors did not see Plaintiff following the alleged onset of his cervical spine problems.

With our conclusion that the assessment of Plaintiff's claim from the wrong onset date is not harmless error, we do not suggest that no evidence of record supports the ALJ's determination.  Rather, in the context of our obligation to strictly construe the Acting Secretary's responsibility to properly weigh the evidence, *Dobrowolsky*, 606 F.2d at 406, we conclude only that we cannot find the ALJ's decision is based on substantial evidence given the considerations discussed above.  Therefore, this matter must be remanded for further consideration.

2.   **Treating Source Opinions**

Plaintiff's second claimed error is that the ALJ did not give appropriate weight to the opinions of treating sources.  (Doc. 9 at

37

13.) Because we remand for further proceedings which will require a reevaluation of the medical evidence of record, including treating physicians' opinions, and because we have found the ALJ's basis for discounting the treating physician's opinions problematic, we need not discuss or make specific findings regarding Plaintiff's second claimed error.[8]

## 3.   **ALJ's RFC Assessment**

Plaintiff's last claimed error is that the ALJ's RFC assessment is not supported by substantial evidence. (Doc. 9 at 19.) Specifically, Plaintiff asserts that the ALJ's RFC assessment is flawed because substantial evidence does not support his finding that Plaintiff could occasionally interact with coworkers and supervisors. (R. 19-20.) Rather, treating physicians Dr. Moskel and Dr. Dever as well as examining consultant Dr. Yelinek opined that Plaintiff would have severe difficulty getting along with other people and this would have a substantial impact on his ability to work. (Doc. 9 at 21.)

Again we conclude that further discussion of this issue is not warranted because the basis of the ALJ's RFC assessment will necessarily be reevaluated in proceedings upon remand.

## V. Conclusion

For the reasons discussed above, this case must be remanded to

---

[8] We note that to the extent treating source opinions are found to be inconsistent with treatment notes of records, citation to the specific treatment notes found conflicting is appropriate.

the Commissioner for further consideration consistent with this

opinion.   An appropriate Order is filed simultaneously with this

Memorandum.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATED: August 28, 2014